1  | A. KENNETH HENNESAY, JR. (BAR NO. 187531)
ALLEN MATKINS LECK GAMBLE
2  |  MALLORY & NATSIS LLP
1900 Main Street, Fifth Floor
3  | Irvine, California 92614-7321
Phone:  (949) 553-1313
4  | Fax:  (949) 553-8354
E-Mail:  khennesay@allenmatkins.com
5  |
Attorneys for Creditors
6  | COASTLINE RE HOLDINGS CORP. and
PACIFIC WESTERN BANK
7  |

8  |            UNITED STATES BANKRUPTCY COURT

9  |            CENTRAL DISTRICT OF CALIFORNIA

10 |            SAN FERNANDO VALLEY DIVISION

11 | In re:                                    | Case No.  1:19-11657-MB

12 | PIERRICK BRILLOUET, and YONG              | Chapter 11
CHU KIM-BRILLOUET.

13 |                                           | **OBJECTION TO DEBTORS'**
**SECOND AMENDED CHAPTER 11**
14 |                                           | **PLAN OF REORGANIZATION, AS**
**REVISED**
15 |                                           | **(DOC 340 FILED APRIL 16, 2021)**

16 |                                           | Date:  November 19, 2021
Time:  10:00 a.m.
17 |                                           | Ctrm:  303
                                                  21041 Burbank Blvd.
18 |                                           |        Woodland Hills, CA 91367
Judge Hon. Martin R. Barash

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................... 6

II.    SECURED CREDITORS' CLAIMS ............................................. 8

III.   DEBTORS' PLAN CANNOT BE CONFIRMED BECAUSE IT
       FAILS TO PROVIDE TREATMENT OF SEVERAL
       UNSCHEDULED CLAIMS OF SECURED CREDITORS
       WITH LIENS OF RECORD .......................................................... 9

IV.    THE COURT CANNOT CONFIRM A PLAN FOR THESE
       INDIVIDUAL DEBTORS BECAUSE THE DEBTORS HAVE
       NOT DISCLOSED THEIR TAX RETURNS ............................... 10

V.     DEBTORS' PLAN VIOLATES THE ABSOLUTE PRIORITY
       RULE ........................................................................................... 10

VI.    THE DEBTORS' PLAN IS NOT FAIR AND EQUITABLE ...... 13

       A.    The Debtors' Plan Does Not Require That Secured
             Creditors Retain Their Liens Until Paid In Full, Or At
             Least Receive The Full Value Of Any Collateral To Be
             Released ........................................................................... 14

       B.    The Debtors' Plan Would Impermissibly Reduce The
             Interest Rate Paid On Secured Creditors' Judgment Lien
             Claims .............................................................................. 15

VII.   THE PROPOSED DEBTORS' PLAN VIOLATES THE "BEST
       INTERESTS OF CREDITORS" TEST ........................................ 19

VIII.  DEBTORS' PLAN VIOLATES SECTION 1129(B)(1)
       BECAUSE IT UNFAIRLY DISCRIMINATES AGAINST
       SECURED CREDITORS ............................................................. 20

IX.    THE DEBTORS DID NOT COMMENCE THIS CASE OR
       FILE THE DEBTORS' PLAN IN GOOD FAITH ...................... 21

X.     THE DEBTORS' PLAN IS NOT FEASIBLE BECAUSE THE
       DEBTORS LIKELY WILL NOT BE ABLE TO TIMELY
       MAKE ALL PAYMENTS UNDER THE DEBTORS' PLAN .... 23

XI.    THE DEBTORS' PLAN FAILS TO PROVIDE APPROPRIATE
       REMEDIES FOR DEFAULT ...................................................... 24

XII.   CONCLUSION ............................................................................ 25

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd.
   (In re Monarch Beach Venture, Ltd.),

5

   166 B.R. 428 (C.D. Cal. 1993) ................................................................. 10, 18

6

Bank of Montreal v. Official Committee of Unsecured Creditors
   (In re American HomePatient, Inc.),

7

   420 F.3d 559  (6th Cir. 2005) ....................................................................... 17

8

Danny Thomas Properties II, L.P. v. Beal Bank, S.S.B.
   (In re Danny Thomas Properties II, L.P.),

9

   241 F.3d 959 (8th Cir. 2001) ........................................................................ 23

10

Everett v. Perez (In re Perez),
   30 F.3d 1209  (9th Cir. 1994) ........................................................................ 10

11

Farm Credit Bank of Spokane v. Fowler (In re Fowler),

12

   903 F.2d 694 (9th Cir. 1990) ................................................................... 15, 16

13

FSLIC v. D&F Constr., Inc.
   (In re FSLIC v. D&F Constr., Inc.),

14

   865 F.2d 673 ................................................................................................. 18

15

In re Brotby,
   303 B.R. 177 (9th Cir. BAP 2003) ................................................................ 13

16

17

In re Camino Real Landscape, Inc.,
   818 F.2d 1503 (9th Cir. 1987) ...................................................................... 16

18

In re Davis,
   2016 WL 7076985, at *2

19

   (Bankr. N.D. Cal. Dec. 5, 2016) .............................................................. 18, 23

20

In re Kennedy,
   158 B.R. 589 (Bankr. D.N.J. 1993) .............................................................. 15

21

22

In re Kim,
   2010 WL 2850784, at *1

23

   (Bankr. N.D. Cal. July 19, 2010) .................................................................. 24

24

In re Manion,
   127 B.R. 887 (Bankr. N.D. Fla. 1991) ......................................................... 15

25

In re Miami Center Assocs., Ltd.,
   144 B.R. 937 (Bankr. S.D. Fla. 1992) .......................................................... 18

26

27

In re Monnier Bros.,
   755 F.2d 1336 (8th Cir. 1985) ...................................................................... 16

28

In re North Valley Mall, LLC,
   432 B.R. 825 (Bankr. C.D. Cal. 2010) ......................................................... 16

**Page(s)**

In re Silberkraus,
        253 B.R. 890 (Bankr. C.D. Cal. 2000) ............................................................ 22

In re Tribune Co.,
        972 F.3d 228 (3rd Cir. 2020) ....................................................................... 21

In re Villa Diablo Assocs.,
        156 B.R. 650 (Bankr. N.D. Cal. 1993) ......................................................... 16

In re VIP Motor Lodge, Inc.,
        133 B.R. 41 (Bankr. D. Del. 1991) .............................................................. 18

In re Weinstein,
        227 B.R. 284 (B.A.P. 9th Cir. 1998) ............................................................ 16

In re Wermelskirchen,
        163 B.R. 793 (Bankr. N.D. Ohio 1994) ......................................................... 9

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship
        (In re Ambanc La Mesa Ltd. P'ship),
        115 F.3d 650  (9th Cir. 1997) ...................................................................... 20

Marsch v. Marsch (In re Marsch),
        36 F.3d 825 (9th Cir. 1994) ......................................................................... 21

Pacific First Bank v. Boulders on the River, Inc.
        (In re Boulders on the River, Inc.),
        164 B.R. 99 (B.A.P. 9th Cir. 1994) .............................................................. 17

Pizza of Hawaii, Inc. v. Shakey's, Inc.
        (In re Pizza of Hawaii, Inc.),
        761 F.2d 1374 (9th Cir. 1985) ..................................................................... 23

Platinum Capital, Inc., v. Sylmar Plaza, L.P.
        (In re Sylmar Plaza, L.P.),
        314 F.3d 1070 (9th Cir. 2002) ............................................................... 21, 22

Steelcase Inc. v. Johnston (In re Johnston),
        21 F.3d 323 (9th Cir. 1994) ................................................................... 11, 12

Till v. SCS Credit Corp.,
        541 U.S. 465 (2004) ................................................................................... 17

Zachary v. California Bank & Trust,
        811 F.3d 1191 (9th Cir. 2016) ...................................................................... 11

**Statutes**

Fed. R. Bankr. P. 3020(b)(2) ................................................................................ 21

11 U.S.C. § 1123(a) ............................................................................................... 7

11 U.S.C. § 1123(a)(4) ........................................................................................... 9

**Page(s)**

11 U.S.C. § 1129..............................................................................................passim

**Other Authorities**

<u>Collier on Bankruptcy</u> ¶ 1129.02[1], n. 5;
    (Richard Levin & Henry J. Sommer eds., 16th ed.)............................9, 10, 21

March, Ahart & Shapiro, <u>Cal. Prac. Guide: Bankruptcy</u>, ¶¶ 11:1419-
    1421 (The Rutter Group).........................................................................19, 20

<u>Norton Bankruptcy Law and Practice 3rd</u>, § 113.11, pgs. 113-27 .........................14

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4881-8952-3457.3

1    Coastline RE Holdings Corp. ("Coastline") and Pacific Western Bank

2  (collectively with Coastline, "Secured Creditors") hereby object to confirmation of

3  the Second Amended Chapter 11 Plan of Reorganization, As Revised (Doc 340, the

4  "Debtors' Plan") filed by debtors Pierrick Brillouet and Yong Kim Brillouet

5  ("Debtors"), as follows:

6  **I.    PRELIMINARY STATEMENT.**

7    Secured Creditors are judgment creditors of the Debtors.  After the Debtors

8  had defaulted on prior loan obligations and attempted to thwart foreclosure by serial

9  bankruptcies and fraudulent transfers, Coastline ultimately was able to foreclose on

10  the Debtors' prior residence.  Even after foreclosure, however, the Debtors refused

11  to surrender the subject property.  The resulting unlawful detainer litigation and the

12  Debtors' so-called "wrongful foreclosure" litigation against Secured Creditors led to

13  judgments entered in favor of Secured Creditors and against the Debtors.  Those

14  judgments and abstracts of judgments are the bases for Secured Creditors' claims in

15  this case.

16    In the course of enforcing the foregoing judgments, Secured Creditors filed an

17  action to avoid fraudulent transfers of title to the additional real property assets of

18  the Debtors (as defined in the Debtors' Plan, the Northridge Property and the Santa

19  Clarita Lots), and obtained a judgment avoiding the transfers, restoring title in the

20  Debtors, and confirming that the abstracts of judgment recorded by Secured

21  Creditors attach to the Northridge Property and the Santa Clarita Lots (the "UVTA

22  Judgment").  The state court found that Debtors transferred their properties with the

23  intent to hinder, delay or defraud creditors.  Debtors appealed the UVTA Judgment

24  but, apparently lacking any confidence in their appeal, filed this case immediately

25  upon the California Court of Appeals setting oral argument on the matter.

26    This chapter 11 case was filed solely to resolve a two-party dispute, as an

27  alternative to Debtors' prosecution of their appeal of the UVTA Judgment entered

28  against them and entities under their control.  This is not an arguable point – the

1  Debtors' Plan explains its purpose (with the Debtors continuing to argue "wrongful

2  foreclosure" even now, after the matter has been litigated beyond finality).

3  Accordingly, the proposed Debtors' Plan violates Bankruptcy Code section

4  1129(a)(3) because it was proposed in bad faith as simply another artifice to delay

5  and frustrate the Secured Creditors' recovery of amounts owed under their

6  judgments against the Debtors.

7      Moreover, the Debtors' Plan cannot be confirmed because it does not comply

8  with all the provisions of Bankruptcy Code section 1129(a) and violates multiple

9  provisions of the Bankruptcy Code, including as follows:

10  • The Debtors have failed to schedule several secured creditors of record
11    and the proposed Debtors' Plan fails to provide for their treatment, in
12    violation of section 1123(a).

13  • The Court cannot confirm the proposed Debtors' Plan because the
14    Debtors have failed to disclose tax returns and amended returns filed
15    during the pendency of the bankruptcy case.

16  • The proposed Debtors' Plan violates section 1129(b)(2)(B), the
17    "absolute priority" rule, by proposing to allow Debtors to retain
18    property even though Secured Creditors' senior claims are not first paid
19    or provided for in full;

20  • The proposed Debtors' Plan violates section 1129(b)(2)(A)(i), by
21    proposing to modify and extend Secured Creditors' judgment lien
22    claims without providing terms that satisfy the fair and equitable
23    standard;

24  • The proposed Debtors' Plan violates section 1129(b)(1) because it
25    unfairly discriminates in its treatment of Secured Creditors, allocating
26    virtually all of the plan's risk of the Debtors' performance to Secured
27    Creditors while other classes of the same or lower priority are provided
28    much more favorable treatment;

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4881-8952-3457.3                    -7-

1    • The proposed Debtors' Plan is not feasible under section 1129(a)(11);

2    and

3    • The proposed Debtors' Plan violates section 1129(a)(7) because it

4    places Secured Creditors in a position materially worse than a

5    hypothetical chapter 7 liquidation.

6        In sum, the proposed Debtors' Plan, which seeks to extend payment of the

7  Secured Creditors' judgment lien claims over 30 years and proposes to pay interest

8  at an interest rate less than half of that to which Secured Creditors are entitled under

9  applicable California law, does not comply with the Bankruptcy Code and cannot be

10 confirmed over Secured Creditors' objections.  Because Secured Creditors do not

11 consent to the treatment of their claims as proposed by the Debtors, the Debtors'

12 Plan cannot be confirmed.

13 **II.    SECURED CREDITORS' CLAIMS.**[1]

14        Secured Creditors' filed their Proof of Claim on November 1, 2019 (Claim

15 No. 11) in the amount of $57,686.48 based on a judgment in their favor in so-called

16 "wrongful foreclosure" litigation commenced by the Debtors prepetition.  Claim

17 No. 11 is a secured claim based on Secured Creditors' recording of abstracts of

18 judgment.  The Debtors' Plan classifies Claim No. 11 in Class 2.

19        Also on November 1, 2019, Coastline filed its Proof of Claim (Claim No. 12)

20 in the amount of $486,752.01 based on judgments and attorneys' fees awards

21 entered in Coastline's favor in prepetition unlawful detainer litigation.  Claim No. 12

22 is a secured claim based on Secured Creditors' recording of abstracts of judgment.

23 The Debtors' Plan classifies Claim No. 11 in Class 3.

24

25

26 [1]  The Court has instructed that evidence will be taken in connection with a trial
27 that is to be set at the pre-trial conference on November 19, 2021, at 10:00 a.m., and that objecting parties need not submit all evidence in support of confirmation
28 objections in advance of the pre-trial conference.  Therefore, this Objection refers to evidence to be presented at trial, without a separate statement of facts with citations to the record.

Secured Creditors have submitted ballots for their Class 2 and Class 3 Claims rejecting the Debtors' Plan.

**III.** **DEBTORS' PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO PROVIDE TREATMENT OF SEVERAL UNSCHEDULED CLAIMS OF SECURED CREDITORS WITH LIENS OF RECORD.**

The Debtors' Plan does not include treatment of the following creditors with abstract of judgment liens of record:

- Abstract of Judgment in favor of City of Los Angeles, Office of Finance, in the amount of $5,085.00 recorded March 13, 2014, as Instrument No. 2014-256862;

- Abstract of Judgment in favor of Emidigia Clorinda Barreto in the amount of $6,700.00 recorded May 2, 2014, as Instrument No. 2014-458740; and

- Abstract of Judgment in favor of Elavon, Inc. in the amount of $11,061.70 recorded September 20, 2018, as Instrument No. 2018-965911.

The existence of these claims is not disputed by the Debtors.  The Debtors' failure to schedule these claims and to provide treatment of such claims in the Debtors' Plan violates section 1123(a)(4).  Consequently, the Debtors' Plan cannot be confirmed.  Collier on Bankruptcy ¶ 1129.02[1], n. 5; 1129.02[2], n. 17 (Richard Levin & Henry J. Sommer eds., 16th ed.) (hereinafter, "Collier") (citing In re Wermelskirchen, 163 B.R. 793, 796 (Bankr. N.D. Ohio 1994) ("The Debtors' Plan violates § 1123(a)(4), as the secured debt on which the Debtors are co-obligors with their son, Robert, was neither scheduled nor accorded plan treatment.")).

IV.    **THE COURT CANNOT CONFIRM A PLAN FOR THESE INDIVIDUAL DEBTORS BECAUSE THE DEBTORS HAVE NOT DISCLOSED THEIR TAX RETURNS.**

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 provides:  "The court shall not confirm a plan of reorganization in the case of an individual under chapter 11 or 13 of chapter 11, United States Code, unless requested tax documents have been filed with the court." Collier, ¶ 1129.02 [17]. Counsel for the Office of the United States Trustee and counsel for the Secured Creditors requested copies of the Debtors' 2019 tax returns during the meeting of creditors held on July 10, 2020.  Debtors' counsel responded that he expected the returns to be filed within approximately one month and would provide when filed. Those returns have not been filed with the Court nor disclosed to Secured Creditors. Counsel for Secured Creditors followed up with a written request for the Debtors' tax returns on April 5, 2021, during meet and confer with Debtors' counsel in connection with the original pre-trial conference on the Debtors' Plan, and has followed up on that request several times during the meet and confer process, but the Debtors' tax returns have not been provided.

V.    **DEBTORS' PLAN VIOLATES THE ABSOLUTE PRIORITY RULE.**

Under the absolute priority rule, no junior class can receive any distributions unless senior classes receive property of a value as of the effective date equal to the allowed amount of such claim.  See 11 U.S.C. § 1129(b)(2)(B).  The interests of debtors or equity holders are always junior to claims of both secured and unsecured creditors.  See Everett v. Perez (In re Perez), 30 F.3d 1209, 1212-13 (9th Cir. 1994); Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 436 (C.D. Cal. 1993).  Consequently, the Debtors are junior to Secured Creditors for purposes of the absolute priority rule.

The Ninth Circuit has held that the absolute priority rule continues to apply to individual chapter 11 cases after enactment of the Bankruptcy Abuse Prevention and

1  Consumer Protection Act.  <u>Zachary v. California Bank & Trust</u>, 811 F.3d 1191 (9th

2  Cir. 2016).  Accordingly, the Debtors may not cram down their plan that would

3  permit them to retain property of the estate post-confirmation without payment in

4  full of Secured Creditors.  <u>Id.</u>, at 1197-98.  That prohibited result is precisely the

5  objective of the Debtors' Plan.

6      Here, the Debtor's Plan violates absolute priority under the Ninth Circuit's

7  ruling in <u>Steelcase Inc. v. Johnston (In re Johnston)</u>, 21 F.3d 323, 330 (9th Cir.

8  1994).

9      In <u>Johnston</u>, a debtor confirmed a plan of reorganization which allowed him

10  to retain certain property and pay himself up to $50,000 in living expenses from

11  estate assets even though not all creditors would receive payment in full on the

12  effective date.  <u>Johnston</u>, 21 F.3d at 329.  One of the debtor's creditors appealed the

13  bankruptcy court's order confirming the plan arguing that the plan violated the

14  absolute priority rule because the debtor retained its property even though the

15  creditor did not receive full payment upon confirmation.  Significantly, while the

16  creditor appealed the absolute priority issue, the creditor failed to appeal the

17  bankruptcy court's determination that the plan was feasible.  <u>Id.</u>

18      In analyzing the absolute priority rule, the Ninth Circuit adopted a simple,

19  rigid standard.  It stated:

20          before the holder of a junior claim, which, of course, must
            include the debtor itself, can receive or retain property of
21          the estate, a bankruptcy court must be satisfied that each
            unsecured senior claimant actually will receive full present
22          payment, or its equivalent, under the plan of
            reorganization.
23
24
25  <u>Id.</u> at 331(emphasis added).

26      The Ninth Circuit further held that while full payment upon confirmation is

27  not necessary to satisfy the absolute priority rule, full future payment must be

28  "established by uncontested findings of the bankruptcy court which are not clearly

1   erroneous, and which 'provide for' such payments in accordance with the feasible

2   confirmed plan." Id. at 330 (emphasis added).  The Ninth Circuit made clear that its

3   ruling was limited to the unique facts of the case before it (and that absent such

4   unique facts it would have to find that the plan violated absolute priority):

5
6   Here, the bankruptcy court's uncontested findings that all
    claims will be paid in full plus interest; that the value of
    Johnston's assets substantially exceeds the amount of
7   Johnston's liabilities; that Johnston is more likely than not
    to perform his plan obligations; and that the plan is
8   feasible; ensuring that unsecured creditors of the estate
    will be paid in full with interest, assures that the
9   requirements of the absolute priority rule are met. Absent
    such findings, which, as we stated, are here tantamount to
10  actual payment, we could not hold that senior class
    members were "provided for" by the Johnston plan.
11  Hence, we hold that the § 1129(b)(2)(B) requirement of
    absolute priority has been satisfied, and has not been
12  violated by permitting Johnston under the plan to retain
    rights in the estate property.
13
14
15  Id. at 331(emphasis added).

16        Given the foregoing, under Ninth Circuit law, the absolute priority rule

17  requires a debtor to make full actual payments to all senior classes upon

18  confirmation unless "uncontested findings" by the bankruptcy court establish that

19  creditors will be paid in full under the plan.  The Debtor's Plan cannot be confirmed

20  under this standard.  The Debtors' Plan does not provide for Secured Creditors to be

21  paid in full on the Effective Date.  Rather, the Debtors propose to pay Secured

22  Creditors over 30 years at a low rate of interest.  The information supplied with the

23  Disclosure Statement does not, however, and the evidence to be presented at trial

24  will not support a finding that this treatment is "tantamount to actual payment."  As

25  little as two years ago, the Debtors had virtually no income.  They have failed and

26  refused to voluntarily pay a single penny of their obligations to Secured Creditors

27

28

1    over the last ten years.  Under these circumstances, the Debtors will not be able to

2    obtain uncontested findings that full payment to Secured Creditors will be made.

3        After their ill-fated detour into Subchapter V, in order to avoid application of

4    the absolute priority rule, the Debtors' revised their plan to provide for an ersatz

5    "new value" contribution, sourced from Ms. Brillouet's mother in Korea.  The

6    proposed contribution of $5,000 to $25,000 is neither reasonably equivalent to the

7    value retained by the Debtors under the Debtors' Plan nor is it actually necessary for

8    implementation of a feasible reorganization plan.  <u>See</u>, <u>In re Brotby</u>, 303 B.R. 177,

9    195 (9th Cir. BAP 2003).  Under the Debtors' Plan, the Debtors will retain the

10   Northridge Property, the Santa Clarita Lots, and their interests in their businesses.

11   Ms. Brillouet's business alone, according to the Debtors' FRBP 2015.3 reports, is

12   valued at $315,165 (using MPSP, or most probable sale price valuation).  The

13   proposed contribution is likewise unnecessary to a feasible plan.  The amount will

14   be used to pay administrative expense claims on the effective date, but it will not be

15   enough to pay all such claims and Debtors' counsel has agreed to payment over time

16   from the Debtors' postconfirmation net income.

17   **VI.    <u>THE DEBTORS' PLAN IS NOT FAIR AND EQUITABLE.</u>**

18       The Debtors' proposed treatment of Secured Creditors, which Secured

19   Creditors do not consent to, does not comply with the cramdown provisions

20   applicable to secured creditors under the Bankruptcy Code, as a matter of law.

21   Specifically, a debtor can only confirm a plan over the objection of a secured

22   creditor where the plan is "fair and equitable."  11 U.S.C. § 1129(b)(2)(A).

23   Accordingly, in order to be "fair and equitable" as to a secured creditor, the plan

24   must provide one of the following treatment options:

25           (i)     (I)     that the holders of such claims retain the liens
26                   securing such claims, whether the property subject to such
                     liens is retained by the debtor or transferred to another
27                   entity, to the extent of the allowed amount of such claims;
                     and
28                           (II)     that each holder of a claim of such class

receive on account of such claim deferred cash payments
totaling at least the allowed amount of such claim, of a
value, as of the effective date of the plan, of at least the
value of such holder's interest in the estate's interest in
such property;

(ii)    for the sale, subject to section 363(k) of this title, of
any property that is subject to the liens securing such
claims, free and clear of such liens, with such liens to
attach to the proceeds of such sale, and the treatment of
such liens on proceeds under clause (i) or (iii) of this
subparagraph; or

(iii)    for the realization by such holders of the indubitable
equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

More simply stated, in order to confirm a plan over the objection of a secured

creditor, the plan must at least provide one of the following:

(i)    the retention of liens and receipt of payments equal
to the value of the creditor's interest in property of the
estate;

(ii)    liens on the proceeds of sale of the collateral and
receipt of payment equal to the value of such proceeds; or

(iii)    realization by the holders of secured claims of the
"indubitable equivalent" of their claims.

Norton Bankruptcy Law and Practice 3rd, § 113.11, pgs. 113-27.

A.    **The Debtors' Plan Does Not Require That Secured Creditors
Retain Their Liens Until Paid In Full, Or At Least Receive The
Full Value Of Any Collateral To Be Released.**

The Debtors' Plan fails to comply with any of the "fair and equitable" tests

under section 1129(b)(2)(A).  Specifically, the proposed Debtors' Plan fails to

comply with section 1129(b)(2)(A)(i) because it does not provide for Secured

Creditors to retain their entire liens, but allows for the refinance of some collateral

and reduction of Secured Creditors' liens against the rest.  Because the Debtors' Plan

does not allow Secured Creditors to retain their liens on all collateral until the liens

1  are actually satisfied, the proposed Debtors' Plan fails to comply with

2  section 1129(b)(2)(A)(i), as a matter of law.

3      In addition, the Debtors' proposed terms (even excluding the potential

4  refinance) do not comply with section 1129(b)(2)(A).  The Debtors propose

5  extending the payment term of immediately due and payable judgment liens to a 30-

6  year mortgage loan, without the typical protections afforded voluntary lenders, such

7  as covenants regarding protecting and insuring the collateral, an interest rate

8  reflective of the substantial additional risks of this loan, and the power of sale by

9  foreclosure upon default.  Thus, the Debtors' Plan simply cannot comply with the

10  fair and equitable standard.  <u>See, e.g.</u>, <u>In re Kennedy</u>, 158 B.R. 589, 599-600 (Bankr.

11  D.N.J. 1993); <u>In re Manion</u>, 127 B.R. 887, 890-91 (Bankr. N.D. Fla. 1991).

12      **B.**      **<u>The Debtors' Plan Would Impermissibly Reduce The Interest Rate</u>**

13      **<u>Paid On Secured Creditors' Judgment Lien Claims</u>**.

14      Under applicable California law, the Secured Creditors are entitled to accrual

15  of interest on the balances of their judgments at the statutory rate of 10%.  The

16  Debtors have offered no authority in this case that they can deviate from this

17  statutory rate.  Moreover, the proposed Debtors' Plan's interest rate of 4.25% is not

18  sufficient to compensate the Secured Creditors for the additional risk and delay of

19  repayment under the Debtors' Plan's terms.  The marketplace would not make a loan

20  as described in the Debtors' Plan.

21      To satisfy section 1129(b)(2)(A)(ii), the present value of the deferred

22  payments must equal or exceed the value of the collateral securing the secured

23  creditor's claim on the confirmation date.  <u>See</u> <u>Farm Credit Bank of Spokane v.</u>

24  <u>Fowler (In re Fowler)</u>, 903 F.2d 694, 696-97 (9th Cir. 1990) ("When the debtor's

25  plan proposes to pay a secured claim in deferred cash installments, the court must

26  find that the present value of the proposed payments is not less than the allowed

27  amount of the secured claim.  In order to make this finding, it will be necessary for

28  the court to apply a discount factor to the proposed stream of payments to determine

the present value of those payments.  This is typically accomplished by ascribing an interest rate to the allowed amount of the claim and by requiring payment of the amount of the claim along with interest at the specified rate."); <u>In re Weinstein</u>, 227 B.R. 284, 294 n.11 (B.A.P. 9th Cir. 1998) (the court must set an appropriate discount rate to be paid on the deferred payments under a plan, so that the creditor receives the present value of its claim); <u>In re Monnier Bros.</u>, 755 F.2d 1336, 1338 (8th Cir. 1985).

"The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved.  Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." <u>In re Camino Real Landscape, Inc.</u>, 818 F.2d 1503, 1505 (9th Cir. 1987); <u>see</u> also <u>Fowler</u>, 903 F.2d at 697 (adopting market rate of interest approach as the appropriate rate).  The relevant factors considered in determining a market rate of interest include the nature and quality of the collateral, the loan to value ratio, the debt coverage ratio, the size and term of the loan, and the risk of default.  <u>See</u> <u>In re Villa Diablo Assocs.</u>, 156 B.R. 650, 653-55 (Bankr. N.D. Cal. 1993).  The Debtors' Plan provides no such support for its proposed interest rate.

A second method for determining the appropriate market rate is use of a formula approach, under which the court starts out with a base rate (e.g., a prime rate) and adds risk factors based on the risk of default and the nature of the security. <u>Fowler</u>, 903 F.2d at 697-98; <u>see</u> also <u>In re Villa Diablo Assocs.</u>, 156 B.R. at 653 (observing that the formula approach may be more useful where the loan to be written is outside normal underwriting criteria such as a 100% loan to value ratio because there is no reliable comparable market data for such a loan); <u>In re North Valley Mall, LLC</u>, 432 B.R. 825, 830-31 (Bankr. C.D. Cal. 2010); <u>Pacific First</u>

Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 164 B.R. 99, 105 (B.A.P. 9th Cir. 1994).

In a chapter 13 context, the Supreme Court addressed the calculation of present value interest in Till v. SCS Credit Corp., 541 U.S. 465 (2004) and held that the "prime plus" or the formula rate is the proper method for determining the interest rate that would provide present value in the absence of an efficient market. Id., at 479-80. Courts have subsequently followed the approach in Till in chapter 11 cases. See, e.g., Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.), 420 F.3d 559, 568 (6th Cir. 2005) (holding that the "market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the Till plurality.").

The formula "approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." Till, 541 U.S. 478-79.

> Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

Id. at 479-80.

Notwithstanding the foregoing authority, the Debtors' Plan seeks to establish a rate of interest by simple analogy to a standard 30-year fixed rate mortgage, in comparison to the Debtors' non-consensual cramdown loan. The treatment of the

1   Secured Creditors' claims bear no relation to a traditional, conforming 30-year

2   residential mortgage loan.  <u>See</u>, Declaration of Steen Weber filed concurrently

3   herewith, ¶¶ 44-54.  The proposed treatment would convert judgment debts due and

4   enforceable for the past approximately six years into a new 30-year obligation,

5   without any of the protections afforded a voluntary lender and subject to the

6   Debtors' claim of homestead exemption.

7           The Debtors' Plan's proposed interest rate does not account for any of the

8   particular risks of non-payment that will be borne fully by Secured Creditors in this

9   case and is therefore not appropriate.  <u>See</u>, <u>In re Davis</u>, 2016 WL 7076985, at *2

10  (Bankr. N.D. Cal. Dec. 5, 2016) (holding that "[t]he court can easily identify several

11  risk factors, including lack of equity, a 30–year term of repayment, and Davis'

12  litigious nature. A 5% rate is clearly insufficient."); <u>see also</u>, <u>Aetna Realty Inv., Inc.</u>

13  <u>v. Monarch Beach Ventures, Ltd.</u>

14  <u>(In re Monarch Beach Ventures, Ltd.)</u>, 166 B.R. 428, 436 (C.D. Cal. 1993)

15  (reversing confirmation and holding that a plan of reorganization cannot unfairly

16  shift the risk of a plan's failure to the creditor); <u>In re VIP Motor Lodge, Inc.</u>, 133

17  B.R. 41 (Bankr. D. Del. 1991) (denying confirmation of where plan provided for

18  deferred cash payment amortized over 30–year term at 10% interest rate, but

19  evidence showed that commercial loans secured against lodging or similar-type real

20  estate were usually only for a short term of years in length, and interest rate and

21  other factors did not compensate for such extended period); <u>FSLIC v. D&F Constr.,</u>

22  <u>Inc. (In re FSLIC v. D&F Constr., Inc.)</u>, 865 F.2d 673 (reversing confirmation of

23  plan that converted construction loan into 15-year negative amortization loan); <u>In re</u>

24  <u>Miami Center Assocs., Ltd.</u>, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992) (denying

25  confirmation of plan where debtor attempted to extend a ten-year loan in its ninth

26  year for another ten years).

27

28

## VII.    THE PROPOSED DEBTORS' PLAN VIOLATES THE "BEST INTERESTS OF CREDITORS" TEST.

The proposed Debtors' Plan violates section 1129(a)(7) because it places Secured Creditors in a position materially worse than they would enjoy in a hypothetical chapter 7 liquidation as a matter of law.  In a chapter 7 liquidation, Secured Creditors would be entitled to retain their liens on all of their collateral until receipt of actual payment on their secured claims, rather than having their lien on one of the Northridge Property or the Santa Clarita Lots eliminated upon a "refinancing" by the Debtors, upon which the Debtors' Plan would compel the Secured Creditors to release their lien on such property.  A refinancing to satisfy the Secured Creditors' liens in full would be allowable, but the Debtors' Plan puts no express limit on the Debtors' discretion to "refinance" and compel removal of liens. The Debtors' Plan does, however, require Secured Creditors to "reasonably cooperate" with a refinance.  The Debtors' Plan cannot be confirmed unless it is revised to make clear that any post-confirmation sale or refinance is conditioned upon (i) Court approval subject to all rights of Secured Creditors (including credit bidding if a sale), (ii) Secured Creditors' consent, or (iii) payment in full of Secured Creditors.

Moreover, without application of an appropriate interest rate, the present value of the deferred payments under the Debtors' Plan will not equal the value of the collateral securing the Secured Creditors' claims on the confirmation date and available to the Secured Creditors upon a prompt liquidation. March, Ahart & Shapiro, Cal. Prac. Guide: Bankruptcy, ¶¶ 11:1419-1421 (The Rutter Group) (hereinafter, "Rutter").  Thus, the Debtors' Plan, as proposed, places Secured Creditors in a position materially worse than they would enjoy in a hypothetical chapter 7 liquidation and violates section 1129(a)(7).

## VIII. <u>DEBTORS' PLAN VIOLATES SECTION 1129(B)(1) BECAUSE IT UNFAIRLY DISCRIMINATES AGAINST SECURED CREDITORS</u>.

Bankruptcy Code section 1129(b)(1) provides that, in order to confirm their "cramdown" plan, the Debtors must show that the "plan does not discriminate unfairly . . . with respect to each class of claims . . . that is impaired under, and has not accepted, the plan."  The Debtors' Plan discriminates against Secured Creditors by providing for payment of a similarly situated secured creditor (ELARCA, Inc., Class 4) and Class 7 General Unsecured Creditors with payment in full within five years, while Secured Creditors are paid over a period of 30 years.

The Debtors bear the burden of proof to show that the discrimination is not "unfair."  <u>Rutter</u>, 11:611.  The Ninth Circuit long ago adopted a four-part test to determine whether discrimination against a dissenting class is unfair:

> (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the class discriminated against.

<u>Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)</u>, 115 F.3d 650, 656 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998).

More recently, the Court of Appeals for the Third Circuit has adopted a new test, holding that there is a rebuttable presumption of unfair discrimination where there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in the terms of net present value of payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

1 <u>Collier</u>, ¶ 1129.03[3][a] (citing <u>In re Tribune Co.</u>, 972 F.3d 228, 241 & n. 6 (3rd Cir.

2 2020)).

3     Under either standard, the Debtor's Plan unfairly discriminates against

4 Secured Creditors.  The Class 4 and Class 7 creditors are to be paid in full within

5 five years, but Secured Creditors are forced to wait for 30 years, until the Debtors

6 are both well into their 80s.  The Class 4 creditor is a second position lien creditor

7 with respect to the Santa Clarita Lots, and is to be paid the same 4.25% interest the

8 Debtors propose for the Secured Creditors, who are in second position on the

9 Northridge Property and third position on the Santa Clarita Lots, under the Debtors'

10 Plan.  This unfairly allocates virtually all of the risk of the Debtors' performance

11 under the Plan to Secured Creditors.  The Debtors could easily propose a plan

12 without that discrimination – the terms of which are even hinted at in the Debtors'

13 Plan and have been suggested by Secured Creditors multiple times in this case.  A

14 plan that provides for the sale of the Northridge Property and Santa Clarita Lots (or

15 a sale of one, then refinance of the second), might be confirmed without any

16 discrimination like that in the Debtors' Plan.

17 **IX.    THE DEBTORS DID NOT COMMENCE THIS CASE OR FILE THE**

18      **DEBTORS' PLAN IN GOOD FAITH.**

19     Bankruptcy Code section 1129(a)(3) requires that a plan must be "proposed in

20 good faith and not by any means forbidden by law."  Upon objection, there is no

21 presumption of good faith by the Debtors, who must prove that the Debtors' Plan is

22 proposed in good faith.  <u>See</u>, Fed. R. Bankr. P. 3020(b)(2).

23     A plan is proposed in good faith where it achieves a result consistent with the

24 objectives and purposes of the Code.  <u>Platinum Capital, Inc., v. Sylmar Plaza, L.P.</u>

25 <u>(In re Sylmar Plaza, L.P.)</u>, 314 F.3d 1070, 1074 (9th Cir. 2002) (citation omitted).

26 "The test is whether a debtor is attempting to unreasonably deter and harass

27 creditors or attempting to effect a speedy, efficient reorganization on a feasible

28 basis."  <u>Marsch v. Marsch (In re Marsch)</u>, 36 F.3d 825, 828 (9th Cir. 1994).  In

1   determining good faith, the bankruptcy court is to consider the totality of the

2   circumstances.  <u>Sylmar Plaza</u>, 314 F.3d at 1074.  All of the facts and circumstances

3   leading up to the filing of the case, and the conduct of the Debtor during the case

4   can be properly considered by the Court in determining whether the plan is proposed

5   in good faith pursuant to section 1129(a)(3), for the Court to be able to confirm the

6   plan.  <u>In re Silberkraus</u>, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000).

7       The evidence at trial will show the Debtors' extreme machinations to evade

8   their obligations to Secured Creditors prepetition (including litigating an unlawful

9   detainer through appeal that the trial judge said was "the most unclean hands case

10  I've seen in 25 years on the bench," so-called "wrongful foreclosure litigation by the

11  Debtors, stalking a bank officer at his home, multiple bad faith bankruptcy filings,

12  and fraudulent transfers of real property Secured Creditors were forced to sue to

13  bring back into Debtors' names).  It is also clear from the record that this case has

14  simply perpetuated a two-party dispute.

15      The Debtors never engaged the Secured Creditors in good faith plan

16  negotiations.  Their only "offers" have been in their filed plans.  Their first plan was

17  filed on the last day of the Debtors' exclusivity period, without <u>any</u> attempt to

18  discuss terms with Secured Creditors (and only after Secured Creditors' motion to

19  dismiss or convert the case was filed).  That plan proposed to "surrender" the Santa

20  Clarita Lots to Secured Creditors and allow the Debtors full credit of the appraised

21  value of that property, without accounting for the title issues of senior liens and the

22  uncertainty of the value of raw land.  Secured Creditors suggested in Court that if

23  the Debtors wanted credit against their debt, the Debtors should market and sell the

24  Santa Clarita Lots and apply actual sales proceeds.  The Debtors have never even

25  applied to employ a broker.  Secured Creditors have made several written plan

26  treatment proposals, including involving the prior Subchapter V trustee.  No

27  counterproposal or other offer has ever been received in return (only some musings

28  of counsel of treatment concepts they might suggest to the Debtors).

The Debtors' Plan that would put off the Secured Creditors' recovery for another 30 years emphasizes that the whole point of this case and of the proposal of the Debtors' Plan was to further frustrate and delay Secured Creditors, while foisting all risk upon them.  There is no true business reorganization proposed here.  Under these circumstances, the Court cannot make a finding that the Debtors' Plan was proposed in good faith, as required by section 1129(a)(3).  <u>See</u>, <u>Davis</u>, <u>supra</u>, 2016 WL 7076985, at *1.

## X.    THE DEBTORS' PLAN IS NOT FEASIBLE BECAUSE THE DEBTORS LIKELY WILL NOT BE ABLE TO TIMELY MAKE ALL PAYMENTS UNDER THE DEBTORS' PLAN.

Section 1129(a)(11) requires that confirmation is not likely to be followed by liquidation or the need for further reorganization.  "Feasibility determinations must be firmly rooted in predictions based on objective facts."  <u>Danny Thomas Properties II, L.P. v. Beal Bank, S.S.B. (In re Danny Thomas Properties II, L.P.)</u>, 241 F.3d 959, 964 (8th Cir. 2001) (internal quotations and citations omitted).  The bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.  <u>Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)</u>, 761 F.2d 1374, 1382 (9th Cir. 1985).  The Debtors bear the burden of demonstrating the feasibility of the Debtors' Plan.

The proposed Debtors' Plan is not supported by ***credible information*** that supports the Debtors' Plan's assumptions.  As little as two years ago, the Debtors had virtually no income.  The Debtors' latest tax returns (attached to the their prior Disclosure Statement) indicate annual income for 2017 of only about ***$20,000 combined for the both of them.***  Nevertheless, the Debtors' Plan inexplicably projects annual income for each of the five years post-confirmation of ***$177,312.*** There is no credible information provided with the Debtors' Plan or Disclosure

1  Statement that explains (or could explain) this great income discrepancy over such a

2  short period of time.

3      Indeed, even if taken at face value, the Disclosure Statement's summary of

4  the Debtors' recent historical performance and projections show that it is much more

5  likely than not that the Debtors will not be able to perform under the Debtors' Plan.

6  The Debtors' project monthly income of $14,776 to fund regular monthly

7  obligations under the Plan.  As shown in the historical information attached to the

8  Disclosure Statement, the Debtors met this mark only once out of the first nineteen

9  months of this case, and only once since, according to the Debtors' Monthly

10  Operating Reports.  Indeed, during the pendency of this case, the Debtors have

11  reported monthly income in an amount below the amount of the proposed monthly

12  Debtors' Plan payments numerous times.  Moreover, the Debtors have failed to pay

13  post-petition property taxes on Secured Creditors' collateral during the pendency of

14  this case.  This would be another plan default if the Debtors continued that practice

15  post-confirmation.

16      In other words, if the Debtors' Plan had already been in effect, the Debtors

17  would have already defaulted several times in less than two years.  No finding of

18  feasibility of this Debtors' Plan can be made under these circumstances.  It is

19  important to note in this regard that the Debtors have failed and refused to

20  voluntarily pay a single penny of their obligations to the Secured Creditors over the

21  last ten years.  Secured Creditors should not be forced to bear the risk of non-

22  payment over a 30-year plan period where the Debtors' decreasing equity leaves

23  little margin for error.  See, In re Kim, 2010 WL 2850784, at *1 (Bankr. N.D. Cal.

24  July 19, 2010).

25  **XI.    THE DEBTORS' PLAN FAILS TO PROVIDE APPROPRIATE**

26  **REMEDIES FOR DEFAULT.**

27      The proposed Debtors' Plan provides that, upon a Material Default (as defined

28  in the Debtors' Plan), the Debtors are entitled to a Notice of Default under the

1  Debtors' Plan, but says nothing about the timing of that notice, or any opportunity to

2  cure or contest the default.  The Debtors' Plan then requires an additional notice

3  under State law, if any, after which Secured Creditors may enforce their "rights

4  under State law."  In other words, all risk of the Debtors' likely failure to perform

5  under the Debtors' Plan is foisted upon Secured Creditors, who after a default

6  confirmed by this Court would be back at square one – left to enforce their

7  judgments under State law.  Based on the radical modification of Secured Creditors'

8  rights under the Debtors' Plan, a failure of the Debtors' Plan should result in either

9  conversion of the case to chapter 7 or allowance of the Secured Creditors to pursue

10 their state law rights.

11 **XII.    CONCLUSION.**

12        The Debtors' efforts to cram down Secured Creditors violates clear and

13 controlling law.  Given the circumstances and Debtors track record to date, Secured

14 Creditors have no faith that the Debtors will perform under the Debtors' Plan.  The

15 Debtors' Plan requires notice to the Debtors and an opportunity to be heard in this

16 Court before a default happens under the Debtors' Plan.  This Debtors' Plan, then, is

17 simply step one in what would likely be an interminable series of defaults for which

18 the Debtors continually seek relief or some opportunity to cure.  The Court should

19 deny confirmation of the Debtors' Plan.

20

21 Dated:  November 5, 2021             ALLEN MATKINS LECK GAMBLE
                                       MALLORY & NATSIS LLP
22                                     A. KENNETH HENNESAY, JR.

23
                                       By:_____/s/ A. Kenneth Hennesay, Jr._____
24                                        A. KENNETH HENNESAY, JR.
                                          Attorneys for Movants
25                                        COASTLINE RE HOLDINGS CORP.
                                          and PACIFIC WESTERN BANK
26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4881-8952-3457.3                      -25-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1900 Main Street, Fifth Floor, Irvine, CA 92614-7321

A true and correct copy of the foregoing document entitled (*specify*): OBJECTION TO DEBTORS' SECOND AMENDED
CHAPTER 11 PLAN OF REORGANIZATION AS REVISED (DOC 340 FILED APRIL 16, 2021)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
Nov. 5, 2021_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV):  russell.clementson@usdoj.gov
Gregory Kent Jones (TR):  gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com
Giovanni Orantes: go@gobklaw.com, gorantes@orantes-law.com, cmh@gobklaw.com, gobklaw@gmail.com,
go@ecf.inforuptcy.com; orantesgr89122@notify.bestcase.com
United States Trustee (SV):  ustpregion16.wh.ecf@usdoj.gov
Randall P Mroczynsk:  randym@cookseylaw.com
Valerie Smith: claims@recoverycorp.com

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will</u>
<u>be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) Nov. 5, 2021_____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is
filed.

Hon. Martin R. Barash
United States Bankruptcy Court - Central District of Calif
21041 Burbank Blvd., Ste. 342
Courtroom 303
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Nov. 5, 2021 | Naomi Campos | /s/ Naomi Campos |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**